THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* LEROY R. LUSCOMB, Appellant.

Argued March 1, 1944; decided April 20, 1944.

*Frederick Wm. Youmans* for appellant. I. The evidence does not sustain a felony·murder. (*People* v. *Mummiani,* 258 N. Y. 396; Code Crim. Pro. § 165; *People* v. *Alex,* 265 N. Y. 192.) II. The verdict was so expressed that the trial court could not carry out the sentence contemplated by the jury. (*People* v. *Leonti,* 262 N. Y. 256; *Band* v. *Bindseil,* 137 N. Y. S. 890; *Dalrymple* v. *Williams et al.,* 63 N. Y. 364; *People* v. *Arata,* 254 N. Y. 565; *People* v. *Shilitano,* 215 N. Y. 715; *Wolfgram* v. *Schoepke,* 123 Wis. 19; *People* v. *Sprague,* 217 N. Y. 373; *Hodgkins* v. *Mead,* 119 N. Y. 166.)

*Arnold M. Griffin, Special District Attorney (Layman G. Snyder* of counsel), for respondent. I. The evidence established the defendant guilty beyond a reasonable doubt. The defendant willfully and wrongfully assaulted the witness Reuben Eck, with the use of a loaded rifle which was a weapon likely to produce grievous bodily harm. This constituted the crime of assault in the second degree, a felony. (*People* v. *Nichols,* 230 N. Y. 221; *People* v. *Smith,* 232 N. Y. 239; *People* v. *Patini,* 208 N. Y. 176; *People* v. *Wagner,* 245 N. Y. 143.) II. The verdict of the jury was proper and valid. (*Johnson* v. *State,* 33 Ariz. 354; *Hamp* v. *State,* 130 Fla. 801; *Grinnell* v. *Phillips,* 1 Mass. 530; *Payne* v. *Burke,* 236 App. Div. 527; *People* v. *Birnbaum,* 114 App. Div. 480; *People* v. *Gallagher,* 75 App. Div. 39, 174 N. Y. 505; *People* v. *Sprague,* 217 N. Y. 373; *Dalrymple* v. *Williams et al.,* 63 N. Y. 361.)

CONWAY, J. The defendant was indicted for murder in the first degree. There were three counts. The first and second charged the commission of murder in the first degree under Penal Law, section 1044, subdivision 1. The third count charged the commission of the crime under section 1044, subdivision 2. That count read as follows: " The said defendant, Leroy Riley Luscomb, on or about the 21st day of April, 1943, at the home of Reuben Eck, at Corbett, Town of Colchester, Delaware County, New York, willfully and feloniously shot and killed Ella May Luscomb with a rifle, the said defendant, Leroy Riley Lus-

comb, then and there being engaged in the commission of the crime of Assault in the second degree upon one Reuben Eck, one Ida Eck and the said Ella May Luscomb, by willfully and wrongfully assaulting said Reuben Eck, Ida Eck and Ella May Luscomb by the use of a loaded firearm or rifle, said loaded fire-arm or rifle being a weapon likely to produce grievous bodily harm, against the form of the statute in such case made and provided and against the peace of the People of the State of New York and their dignity.'' After a full and correct charge the jury found the defendant guilty under that count without recommending life imprisonment. Under the first and second counts the trial court charged that the defendant might be convicted of murder in the first or second degrees or of manslaughter in its first or second degree. (See *People* v. *Moran,* 246 N. Y. 100, 105.)

In order to discuss the law it is necessary to view it against a background of fact. As to most of the facts there is no dispute until we come to the occurrences immediately preceding the murder. The defendant and his wife had been married thirteen years and lived in Downsville, N. Y. They had had four children, one of whom, Janet, had died. The living children were aged respectively twelve, nine and six. Both husband and wife worked and neglected their children. The defendant had been intimate with one Onufer aged twenty-one, who apparently was the mother of a child by him. On April 17, 1943, while the defendant and the Onufer girl were at a dance hall and hotel at Long Flats, N. Y., the deceased wife entered and approached them. Words passed between the two women and the deceased left the hotel. Later the defendant and the Onufer girl left.

When the defendant arrived home on Sunday, April 18th, he found that his wife had departed taking the youngest child with her. She had returned to the home of her father one Reuben Eck, at Corbett in the town of Colchester.

To Eck's home the defendant sent a letter by his oldest son on Monday, asking the deceased to return saying that he would be '' true to you from this day on.'' The deceased had previously left the defendant on two prior occasions because of his excessive indulgence in liquor. After the delivery of the letter the deceased did not return. On Tuesday morning defendant left

a second letter on the kitchen table of his home asking the deceased to return to him. Deceased, however, failed to return.

On Wednesday, April 21st, the defendant did not work but went fishing with his oldest son. They returned home about two o'clock in the afternoon and the defendant went to the village of Downsville, where he had some beer. At about six o'clock he came home and had his evening meal with his children. He obtained his Winchester rifle, loaded it and drove with the children to a restaurant where he had a bottle of beer and the children had soft drinks. He then drove to Corbett to the home of Reuben Eck. He entered through the woodshed door. The deceased was seated in the kitchen.

Ida Eck, the mother of deceased, said that at about a quarter after seven in the evening one of her grandsons came in and asked her daughter to go outside to see the defendant; that when her daughter refused, she heard her grandson say, " Ma, you better go because he's got a gun and he's going to shoot you "; that then she heard the defendant enter the kitchen and say to her daughter in a loud voice " Ella, I want you to get your clothes and things and Dixie [the six year old child] and go home. Do you hear? "; that she then heard a scuffle in the kitchen but could not hear any conversation; that when her husband went into the kitchen she followed him as far as the doorway and stood there; that the defendant had a rifle which he held with both hands; that defendant said to her husband, " None of your funny business here. Don't come a step further "; that the rifle was pointed at her husband; that he swung the gun around " onto me " and said, " or you, either * * * damn you, I think you are a lot to fault of this "; that he pointed the gun at her for a minute and when he swung it around she left the room; that she then heard the defendant say " I'll clean up the whole damn bunch of you "; that she then went upstairs and when she reached the top of the stairs she heard a shot.

Reuben Eck testified that when he entered the kitchen he saw the defendant " with his wife with her back up against the kitchen table, and he had hold of her clothing like that and was ashaking her "; that when the defendant saw him "he let go of her and grabbed up the rifle, and he said to me, ' None of your damn funny business, * * * don't come a step farther ' ";

that the defendant, holding the gun in both hands, pointed the rifle right at him; that at that time Mrs. Eck stepped in the door and defendant turned the rifle in her direction and said, " G — d — you, I think you are a whole lot to fault of this "; that defendant then laid the gun back on the table and took off his jacket and laid it on the table, and said, " I'll clean up the whole damn bunch of you "; that he told the defendant that no one was at fault and defendant replied, " Rube, I don't think you are to fault. I have always liked you " and that they shook hands; that then the defendant picked up the rifle and swung around to the deceased and said, " Now, Ella, G — d — you, you are going home with me, or I'm going to kill you right here "; that decedent refused to go home with defendant and after a couple of seconds the gun was discharged; that at that time deceased was about three feet from the defendant and he (Eck) was about four feet from him; that deceased did not turn the defendant around; and that the witness never attempted to seize the rifle; that during the entire time he remained in one spot, that being the spot he reached when defendant told him not to come one step nearer. Eck was asked " Do you wish this jury to understand that you, the father of this girl, stood and took all that." His reply was, " What could I do? "

It was the defense of defendant that in the kitchen he asked his wife to go home with him and the children and that she refused; that he asked her more than once why she would not return but that the only answer he obtained was " because I won't "; that he then said to her " You will go home "; that at about that time her father and mother came from the sitting room and walked up to a point opposite the reservoir on the stove and stopped; that he told them he wanted his wife to go home with him and for them " to keep their nose out of my business "; that Mrs. Eck turned and went back into the living room; that Mr. Eck mumbled something and that the defendant turned back to the table in the room, took his coat off and, laying the rifle upon the table, stepped back in front of Eck; that the defendant took his jacket off " because Eck was mad ". Continuing the defendant said: " So I stood there facing him. He stood by the reservoir and he did not say another word so I picked the gun up and turned around and stepped up in front of him, about two feet from him and I told him that I did

not think that he had anything to do with my wife not coming home with me but that her mother did, I thought. At that time my wife come up behind me and grabbed me and swung me around and at that time he grabbed me by the arm and my gun went off and shot my wife and she fell to the floor toward the kitchen cabinet and I told him to get a doctor quick.''

The autopsy showed that the bullet which caused death '' entered the front of the neck '' and passed through a major blood vessel, the windpipe, the spinal column, spinal cord, and '' came out at the back of the neck.'' The coroner testified that the muzzle of the rifle had been at least two or three feet from the body and that there were very slight marks '' probably powder burns — not very marked ''.

At common law murder was committed where one unlawfully and feloniously killed another human being with malice prepense or aforethought either express or implied. (I Wharton's Criminal Law, § 419.) Malice prepense was implied at common law, however, in cases where the homicide was not intended but occurred during the commission of a collateral felony.

Our statute now defines murder in the first degree in Penal Law, section 1044, subdvision 2, as the killing of a human being when not excusable or justifiable, committed without a design to effect death, by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise. Both at common law and under the New York statute there is a transference of intent from the felony to the homicide by implication and the homicide becomes one committed with malice prepense. We have used the word '' collateral '' in connection with the commission of murder in the first degree because in certain instances the original felony is considered merged with the homicide and in such instances section 1044, subdivision 2, is not applicable. Thus an assault is merged in the homicide where the one assaulted is the one who dies. If the one assaulted is not killed but during the assault another is, that may constitute murder in the first degree. (*People* v. *Giblin*, 115 N. Y. 196; *People* v. *Patini*, 208 N. Y. 176; *People* v. *Wagner*, 245 N. Y. 143.) That necessitates a finding that the one killed suffered his wound

while the assault upon the other was still continuing. In this instance, therefore, we must consider these questions: — *First,* was there an assault upon someone other than the deceased? Was that assault continuing so that we may say that the fear and threat involved therein continued to the time when Mrs. Luscomb was shot. Was the assault upon Eck an independent felony?

The indictment charged the commission of the murder while the defendant was engaged in the commission of the crime of assault in the second degree upon Eck. The trial court properly charged that the assault upon Mrs. Eck had been terminated and that it could not be considered in connection with the murder. As to Eck, the trial court charged the jury that, in order for defendant to be held to be engaged in assault in the second degree, it must find that the rifle was pointed at Eck in a threatening manner, with intent to injure him if he failed to comply with the defendant's demands and that Eck must have been put in fear of bodily harm. By Penal Law, section 242, subdivision 4, it is provided that one who willfully and wrongfully assaults another by the use of a weapon or other instrument or thing likely to produce grievous bodily harm is guilty of assault in the second degree, a felony.

It seems to us that the trial court made a clear and correct charge on the third count of the indictment under our previous decisions in *People* v. *Giblin* (115 N. Y. 196 [1889]); *People* v. *Patini* (208 N. Y. 176 [1913]); and *People* v. *Wagner* (245 N. Y. 143 [1927]). We shall quote briefly from it: " The second theory upon which the People present this case to you is based on what is known as felony murder. This is also murder in the first degree. It is defined as the killing of a human being without a design to effect death by a person engaged in the commission of or in an attempt to commit a felony either upon or affecting the person killed or otherwise. Under this count no premeditation or deliberation or any intent or design to effect death is necessary. That is, the commission of a felony, the commission of an independent crime during the progress of which a homicide occurs takes the place of and is a substitute for the premeditation and deliberation required by the so-called common-law type of murder. The essential elements are a felony and a killing committed *during the period between its inception and its consummation.* The underlying felony depended

upon here is second degree assault which, so far as this case is defined, is defined as the wilful and wrongful assault upon another by the use of a weapon likely to produce grievous harm. To constitute assault, it is not necessary that the person assaulted be injured or even touched. It is sufficient if an attempt is made coupled with a present ability to commit a violent injury to another. So far as the present case is concerned, the defendant is *guilty of assault in the second degree if you find that he pointed a firearm at Reuben Eck in a threatening manner and with an intent to injure him if he failed to comply with his demands and if Reuben Eck was, by this defendant's act, put in fear of bodily harm.*

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

" On this felony murder and speaking of the independent felony, the basic felony, that of assault, *you must find that it was still in the process of commission at the time of the shooting.* That is, if Reuben Eck and the defendant had settled their differences, if they had made up, if the defendant had abandoned any attempt to assault Reuben Eck before the commission of this shooting, before the shooting occurred, then you must find that the felony had terminated and consequently it may not be the basis for a felony murder. If you find from the evidence that Luscomb did commit an assault upon Mr. Eck and if you further find that this slaying of Ella May Luscomb took place while the assault was in the process of commission, you may then find the defendant guilty of murder in the first degree regardless of whether or not the defendant had any intention or design to kill his wife and even though you might find such killing to have been accidental." (Emphasis supplied.)

Again the court charged " under this count [felony] no premeditation or deliberation or any intent or design to effect death is necessary. That is, the commission of a felony, the commission of an independent crime during the progress of which a homicide occurs takes the place of and is a substitute for the premeditation and deliberation required by the so-called common-law type of murder. The essential elements are a felony and the killing committed during the period between its inception and its consummation."

If the defendant entered the kitchen of Eck and held him at bay with a rifle and while Eck was thus restrained by the threat that he would be shot if he took a step forward and if while he was in the grip of fear produced by that threat, the defendant purposely or accidentally shot and killed his wife, that was murder while engaged in the commission of a felony. Here the jury could find that those were the facts. Eck was in his own home and a man's home is still his castle. His daughter had found retreat there for the third time from her wastrel husband. Eck lived there with his wife. When the defendant entered with his rifle there was no place to which Eck as the protector of his wife and daughter could retreat or in which he could find refuge. The defendant entered through the woodshed door and when Eck, hearing him, came from the sitting room and found the defendant shaking his daughter, he started forward. He paused some four feet from the defendant when the latter pointed the rifle at him and told him not to take another step and in that position he remained until his daughter was killed. Mrs. Eck came forward and was driven from the room at rifle point. Because Eck appeared angry the defendant took off his jacket, after laying the rifle upon the table, so as to " clean up " all present. There can be no question but that the assault upon Eck had commenced. The trial court properly charged that when Mrs. Eck left the room the assault upon her had been terminated and, as to the deceased, there had been a merger in the homicide of the assault upon her. After taking off his jacket and before taking up the rifle again Eck says that the defendant shook hands with him and said that he knew Eck was not to blame for his troubles. (The defendant denied that he shook hands with Eck.) The defendant then picked up the rifle again, but not his jacket, which he had removed so as to be freer in his movements, and swinging around upon the deceased said, " Now, Ella, G — d — you, you are going home with me, or I'm going to kill you right here." When she refused, the defendant killed her. Assuming that the jury believed Eck, to say that the menace of the defendant, who had just removed his jacket to be freer to commit assault, was ended because he paused to shake hands with Eck before again picking up his rifle and telling the deceased that he was going to kill her right there in her father's home if she did not

go with him, seems to us to disregard all that went before and all that immediately followed after the shaking of hands. The jury may have found that Eck, in his own home with two women whom he was under duty to protect, dealing with an enraged man armed with a rifle, who had just shed his jacket to make it easier for him to commit violence upon all present, would have shaken hands with the defendant almost automatically, if not prayerfully. The question and the answer of Eck quoted (*supra*), illuminates the background of the act: " Do you wish this jury to understand that you, the father of this girl, stood and took all that? " And his answer, " What could I do? " True, under the judge's charge, the jury could have found that the assault had terminated and had they so found there would have been no felony murder. The jury was drawn from the vicinage. They were farmers and householders, or their wives, in the county where this occurred. They were the ones who could properly decide whether the assault upon Eck was continuing regardless of the fact that the defendant in the middle of it stuck out his hand and shook the hand of Eck when the latter was seeking to pacify him. They were competent to decide that as a question of fact and that is what it was. We cannot say as a matter of law that those jurors were obligated to find that the assault upon Eck had terminated or that the finding is against the weight of the evidence.

Finally, can it be said that this was such an independent felony as is contemplated by the statute? It seems to us that we so held in the *Giblin, Patini* and *Wagner* cases cited (*supra*) and that they control here.

In the *Giblin* case, the defendant tendered a bill in payment for a purchase and when one Goelz asserted that it was a counterfeit he drew his pistol upon Goelz demanding with a threat, change of it. During the scuffle which ensued and after several shots had been fired, two of which had struck Goelz, the deceased came into the store and ran to her husband's assistance. She seized hold of defendant from behind and endeavored to rescue her husband from him. " Holding his hand behind him, the defendant fired at her and the bullet entered her abdomen, inflicting the wound from which she died on the day following." (p. 198.)

In the *Patini* case, the defendant stood with a loaded shotgun in front of a house and threatened to shoot those who came out, compelling those who did to return inside. '' When Giovanni Vasta, the brother of the deceased, came out of the house and saw the defendant point his gun at him, he called out to him to ' look out; there are people around here.' The defendant said, ' I don't care, I will shoot you too, unless you go back.' Giovanni asked him, if he could not go home by the public street, that he was in a hurry. He started to do so and walked close to the fence, and away from the defendant; but the latter kept his gun pointed at him. While doing so, Giovanni's brother, Guiseppi Vasta, the deceased, came from the other side of the street and exclaimed to the defendant ' what are you doing, look out, what you point that gun to my brother for? ' The defendant replied, ' You keep still, stay where you are, otherwise I shoot you too.' As he said that, he turned and shot Guiseppi and then shot Giovanni. Guiseppi was killed; but Giovanni recovered from his wounds.'' (p. 179.) We there held explicitly that if the defendant pointed his gun at Giovanni, at the same time threatening to shoot him if he did not stand still, that constituted assault in the second degree and that if, in pursuance of his purpose to commit the assault, he shot and killed the deceased he was guilty of murder in the first degree. We said that the felony of the assault upon Giovanni had not ceased and had not merged with the homicide. We distinguished *People* v. *Hüter* (184 N. Y. 237) and *People* v. *Spohr* (206 N. Y. 516) and then said: (p. 180) '' In the present case, the defendant was committing, or attempted to commit, an assault upon Giovanni Vasta by menacingly pointing his gun at him and that assault was quite *distinct from the homicide*. When, because of the threatened interference of the deceased, the defendant turned his gun away from Giovanni, the felonious assault was *interrupted, but had not ceased;* for the defendant, after having shot the deceased, turned back and shot Giovanni. The minor felony committed upon Giovanni was independent of the homicidal act. The case does not differ, in its essential features, from that of *People* v. *Giblin* (115 N. Y. 196).'' (Emphasis supplied.)

In the *Wagner* case, one Lulu Saddlemire rented rooms in a three-story house. The defendant rented a room and two days later the suspicions of Miss Saddlemire were aroused by the

conduct of the defendant on the second floor when his room was upon the third. After some minutes in one of the rooms there, the defendant faced Miss Saddlemire with his right hand behind his back. After some inquiries by Miss Saddlemire, the defendant struck her upon the head with an object wrapped in a towel. A struggle followed in which she called for her father and one Peter Basto. The latter rushed upstairs and finding the defendant with his hand upon her throat, struck the defendant a blow upon the head. The defendant released Miss Saddlemire and struck at him. She ran downstairs and called for help. While at the front door she heard two or three pistol shots and then heard Basto say, " I'm murdered, I'm murdered." We held that the defendant might be convicted of murder in the first degree while engaged in the commission of any one of three felonies: (1) burglary; (2) grand larceny, and (3) assault in the second degree. We said (at p. 149) that the Trial Judge properly charged that the defendant might be convicted of murder in the first degree if he killed Peter Basto, while engaged in the commission of a felonious assault upon Miss Saddlemire. We also said, " If it be true, as we have held it to be, that the original assault was an ingredient of the subsequent killing, was included therein and comprehended thereby, then for the very reason that the felonious assault upon Peter Basto was not a crime precedent to a homicide committed upon him, it must be held that the homicide had its inception, and was committed, when the felonious assault upon Lulu Saddlemire was still in progress. That was an independent felony. (*People* v. *Patini*, 208 N. Y. 176.) It follows that the jury might have found that the defendant killed Peter Basto while ' engaged in the commission of a felony ' within the meaning of subdivision 2 of section 1044 of the Penal Law."

In *People* v. *Moran* (*supra*) we pointed out the differences between that case and the *Wagner* case. Thus we said (p. 104): " We are told that Byrns grappled with the defendant to save a brother officer from the threat of fresh attack, or that so a jury might determine. Reference is then made to *People* v. *Wagner* (*supra*) as authority for a holding that a struggle thus begun is one connected with another felony so that intent is unimportant. In all this, there is a futile attempt to split into

unrelated parts an *indivisible transaction.* The attack upon Daskiewicz was not separate and distinct in *motive* or *origin* from the one upon Byrns. The summons by the defendant to surrender was aimed equally at each, and so was the threat of the revolver which he drew from his pocket to emphasize his words. At that *very moment* there began a felonious assault directed *against both,* against one as plainly *as the other* (Penal Law, § 240, subd. 1). Byrns did not plunge into a fight to which he had *hitherto been a stranger, intent upon rescue and nothing else.* He was in the fight from the beginning, a sharer of its perils from the moment the assault began (cf. *People* v. *Spohr, supra*). * * *.'' (Emphasis supplied.)

And again on page 105 : '' Wagner was engaged in an assault upon a woman when Basto, another occupant of the same house, came to the woman's rescue, and in the ensuing fight was killed. We held that the trial judge did not err in permitting the jury to say that the homicide was by one engaged in a separate or independent felony, the assault upon the woman. *The other grades of homicide were charged.* The jury were not told that the evidence was susceptible of one interpretation and no other. The case was put to them *in all its phases,* with instructions appropriate to each. There is little need to elaborate distinctions. They appear upon the surface. Basto, a stranger to the fight, plunged into it while it was yet in progress, to stay the commission of a felony upon the person of another. * * *.'' (Emphasis supplied.)

The judgment of conviction should be affirmed.

LEHMAN, Ch. J. (dissenting) : On the night of April 21, 1943, Ella May Luscomb was shot and killed at the home of her father. The fatal shot was discharged from a rifle then held by the defendant. The defendant was charged with murder in the first degree. The indictment contains three counts. In the first two counts the indictment charged that the killing was committed from a deliberate and premeditated design to effect death. In the third count the indictment charges that the defendant '' willfully and feloniously shot and killed Ella May Luscomb * * * then and there being engaged in the commission of the crime of Assault in the second degree upon one Reuben Eck, one Ida Eck and the said Ella May Luscomb

\* \* \*.'' Upon the first counts the court charged all the grades of homicide. Upon the third count the court charged that if the jury found that the killing was committed by the defendant while engaged in the commission of an assault upon Reuben Eck the verdict must be murder in the first degree, but the jury might as a part of its verdict recommend that the defendant be imprisoned for the term of his natural life. The jury found the defendant guilty upon the felony count without such recommendation.

After the defendant was found guilty upon that count and sentence of death was imposed, the defendant's attorney moved to set aside the verdict upon affidavits of all the jurors to the effect that '' it was the opinion and idea of the jury that the verdict as rendered would carry to the defendant life imprisonment or such reduction of the sentence as the court might see fit to impose.'' We are agreed that the motion was properly denied. The jurors cannot '' properly be permitted to declare, with a view to affect their verdict, an intent different from that actually expressed by the verdict as rendered in open court.'' (*Dalrymple* v. *Williams,* 63 N. Y. 361, 363.) Argument based on such affidavits may be addressed to the executive. We may review only the judgment which is not affected by them. The only question which we may consider upon this appeal is whether the finding of the jury that the defendant killed his wife in the commission of an assault upon her father Reuben Eck is in accordance with the law and the weight of the evidence.

The relevant facts established by the evidence produced by the People are stated in the opinion of Judge CONWAY. The defendant was an unfaithful husband, an irresponsible father who habitually drank to excess. Because of his bad habits, his wife left him and returned to her father's home. He sent her a note begging her to come back. She refused. Then the defendant went to the father's home. He had drunk many bottles of beer in the afternoon and evening of that day. He carried a rifle. In the kitchen of her father's house he commanded her to return home. There was a '' scuffle '' and her parents hearing the noise went into the kitchen. There is evidence which the jury could accept, though denied by the defendant, that the defendant was '' shaking '' his wife and that as her parents came into the kitchen he released his wife and, pointing his

rifle first at the father and then at the mother, he threatened to shoot them. It may be conceded that the defendant then and there committed an assault on them and if the death of the deceased had been the result of violence *used by the defendant in order to accomplish that assault,* the killing would have been committed " by a person engaged in the commission of  *  *  * a felony " and would have constituted murder in the first degree (*Buel* v. *The People,* 18 Hun 487, affd. 78 N. Y. 492) as explained in *People* v. *Hüter* (184 N. Y. 237). So, too, the killing would have constituted murder in the first degree if the defendant had killed either parent who was attempting to prevent him from continuing his assault on his wife. (*People* v. *Giblin,* 115 N. Y. 196; *People* v. *Patini,* 208 N. Y. 176; *People v. Wagner,* 245 N. Y. 143.) Here, however, the mother of the deceased frightened by the threat of the defendant, ran off and there is no evidence that the shot which killed the deceased was directed against Reuben Eck, the father of the deceased, or was intended to prevent the deceased from interfering with any assault against the father, or in order to carry out a design to assault the father.

On the contrary the testimony of Reuben Eck which established that the defendant assaulted him by pointing a gun at him threatening to shoot, establishes also that thereafter the defendant laid the rifle on a table, took off his jacket, threatening to " clean up the whole bunch of you." Eck tried to pacify the defendant, telling him that no one was at fault. The defendant said, " Rube, I don't think you are at fault. I have always liked you," and shook hands with Eck. Then the defendant picked up the rifle, turned to his wife, and threatened to kill her unless she went home with him. She refused and a few seconds thereafter she was killed by a bullet discharged from the rifle held by the defendant.

Perhaps the jury could find that even though the defendant put down his rifle and shook hands with Eck in friendly manner, yet that he did not withdraw his threats and that Eck still remained in fear that the defendant would carry out his threats if he interfered. It is clear, however, that the defendant was no longer pointing a gun at Eck and temporarily at least the assault against Eck had ceased. The question then is whether

in any view of the evidence it can be said that the defendant killed his wife while he was committing an assault upon Eck.

We are told that even though the felonious assault on Eck was for the moment interrupted it had not ceased and that the court so held under analogous circumstances in *People* v. *Giblin* (*supra*); *People* v. *Patini* (*supra*); *People* v. *Wagner* (*supra*). In those cases the deceased attempted to come to the assistance of another who was *at that time* being assaulted and received a death wound *in the attempt*. In *People* v. *Giblin* the husband of the deceased was resisting an assault when the deceased came to his aid. In *People* v. *Patini* the defendant was assaulting Giovanni Vasta a brother of the deceased when the deceased Guiseppi came to his brother's aid. In its opinion in *People* v. *Patini* this court explained why in *People* v. *Giblin* it sustained a judgment convicting the defendant of murder in the first degree in the commission of a felony saying: "The evidence showed that the homicide was committed *while* the defendant was engaged in the commission of a felonious assault upon the husband of the deceased. A dispute had arisen between the husband and the defendant over the genuineness of a five-dollar bill; in the course of which the defendant drew his pistol upon the former. The deceased came into the store and, rushing to her husband's assistance, seized hold of the defendant from behind. In that position, he fired upon, and killed, her. We sustained the conviction of murder in the first degree, upon the theory that *the deceased received her death wound in the attempt to aid her husband, upon whom the defendant was committing an unwarrantable assault.*" (p. 181.) (Italics through this opinion are new.) It thus appears that in *People* v. *Giblin,* at the time the defendant made the fatal assault on the deceased, his assault on her husband had not ceased or been interrupted and the violence which resulted in the death of the deceased was exercised in the furtherance of the original assault. In *People* v. *Patini* the circumstances were exactly similar except that there it might perhaps be said that the original assault was temporarily interrupted when the defendant turned his gun away from one brother and shot the brother coming to the rescue. The court, however, pointed out that even if the assault was "interrupted" it had not ceased, saying: "When, because of the threatened interference of the deceased, the defendant turned his gun away from

Giovanni, the felonious assault was interrupted, but had not ceased; *for the defendant, after having shot the deceased, turned back and shot Giovanni."* (p. 180.) None of the circumstances which this court said justified the decision in those cases are present here.

Nor can support for the decision be found in *People* v. *Wagner (supra).* Again it appeared there that the deceased, Peter Basto, came to the rescue of Lulu Saddlemire while the defendant was striking her upon the head. '' The defendant then had his hand upon the throat of Miss Saddlemire. He released his hold only when Peter Basto struck him a blow. *At that moment the defendant began the assault upon Peter Basto which ended in the latter's death. Thus the fatal assault began at a moment when the assault upon Lulu Saddlemire was in progress."* (p. 149.) In the case we are considering now it should be noted again that the defendant on the contrary had turned his gun away from Reuben Eck and Eck was in no present danger from the defendant and subject to no threat unless he thereafter should come to the aid of his daughter who was being assaulted. In my opinion a finding that the assault on Eck, though interrupted, had not ceased is without support in the evidence.

Even if, however, it could be said that the assault on Eck was merely interrupted and had not ceased or even if it could be said that it was in progress when the deceased was shot, because the fear inspired by the assault continued, a finding that the fatal assault on the deceased was committed *in the commission* of the assault on Eck would not be in accord either with reason or authority. It is not sufficient that the killing occurred *while* another felony is in progress. It must be perpetrated while the defendant is '' *engaged* in the commission of   *   *   *   a felony." The killing must occur *in the commission of the felony.* In other words the fatal assult must be a part of the underlying felony. Thus in *Buel* v. *The People (supra,* p. 497) we said it is sufficient '' if death ensued *in consequence* of that felony." The matter is considered at greater length in *People* v. *Hüter (supra,* p. 243) where the court said: '' A person who attempts or engages in the commission of a felony, is not only chargeable with express malice, but also with being perversely wicked, evincing a depraved mind and a disregard of human life, and if, while so engaged, he causes the death of a person, although unin-

tentional, the Legislature has seen fit to enlarge the crime and make it murder in the first degree, so that, if a person *engaged* in the commission of a rape and *in order to accomplish the act* resorts to violence, from which death is unintentionally produced and which would be only manslaughter were it not for the malice, wickedness and intent to rape, yet by reason thereof it is made murder in the first degree. (*Buel* v. *The People,* 78 N. Y. 492.) The same is true with reference to the unintentional killing of a person while engaged in the commission of a robbery, a burglary or an attempt to escape from imprisonment. There may be no intent to kill, but the violence having been perpetrated while engaged in the robbery, burglary or attempt to escape from imprisonment, it is murder in the first degree." There must, it was held, be an " independent felonious design." " By the same act one may commit two crimes, and to constitute murder in the first degree, as in the commission of a felony, it is not necessary that there should be an act collateral to or independent of that which causes the death; but *if the act causing the death be committed with a collateral and independent felonious design it is sufficient;* thus, if the violence *used to commit* a rape or a robbery results in death the case is plainly within the statute, and so this court has held in the cases above referred to." (p. 244.) Thus, the killing of Ella May Luscomb was committed " in the commission " of an assault against Reuben Eck, her father, only if the act was committed with an " independent felonious design " in furtherance of the assault against Eck.

That rule has been applied by this court in *People* v. *Moran* (246 N. Y. 100) where it was claimed that an assault constituted the underlying felony. The evidence there showed that the defendant simultaneously assaulted two police officers and killed both. The fatal assault on each occurred when the assault on the other was in progress, but we held that the killing of the police officer for which Moran was on trial did not occur in the commission of an assault on the other unless it appeared that the deceased officer was killed while " intent upon rescue " of his fellow officer.

In the instant case the evidence shows indisputably that the defendant went to the home of Reuben Eck with the purpose of inducing or compelling his wife to return to his home. He may, perhaps, have intended to assault her if she refused. The

assault by defendant on his wife's parents occurred during a heated dispute between the defendant and his wife and perhaps during an assault by defendant on his wife when her parents entered the room — probably to aid their daughter. Perhaps the assault on Eck may have been committed during and in further-ance of an attack on the deceased and to prevent them from interfering. It cannot possibly be found that the assault upon the deceased was committed to prevent her from interfering in the assault on Eck or with a " nefarious " intent to further that attack independent of the nefarious intent involved in the attack on the deceased.

The cited cases show that such an independent nefarious intent is an essential element of a " felony murder " and the language in the opinion of this court in *People* v. *Moran* which has been italicised by Judge CONWAY shows that the court reversed the conviction of a confessed and defiant murderer because there was no proof or finding of such intent. The judg-ment of conviction should be reversed and a new trial ordered.

LEWIS, DESMOND and THACHER, JJ., concur with CONWAY, J.; LEHMAN, Ch. J., dissents in opinion in which LOUGHRAN and RIPPEY, JJ., concur.

Judgment of conviction affirmed.